The District Court's grant of summary judgment cannot be justified in this case unless the District Court is entitled to defy the U.S. Supreme Court in what the U.S. Supreme Court said in the re-sketch. Mr. White, can you put the microphone a little bit more to the side? How's that, Your Honor? The older I get, the slower I get, Your Honor. As Your Honor knows, the Reeves case said that if the plaintiff makes out a prima facie case, which we did, because we showed that a white male was preferred over a black female, if the defendant then articulates some nondiscriminatory reason, I'll talk about that in a minute because it's very doubtful they did, but assuming they did and we show that whatever reason they articulated is pretextual, then we're entitled to let the jury decide. At that point, the jury gets to decide. There was a caveat in Reeves, which I guess is the heart of their defense, a caveat that if the evidence of pretext is weak and they produced uncontroverted, abundant, uncontroverted evidence that some nondiscriminatory reason was the reason, then that way they'd get a directed verdict. That's the only way. Now, Your Honor, let me just mention these reasons, their so-called articulation of reasons. It comes mostly from, as long as I've been doing this, I've never seen this done before. It mostly comes from tape recordings. The decision-maker, there are two decision-makers in this case, Police Chief Abbey and the Housing Director Hill, but Abbey went up and did a tape with Ms. Franks in which Abbey said, well, it's all based on qualifications. This guy, this white guy had been an officer of the year and he worked everywhere and he was highly qualified. That's the part they argued and put in their brief as to the reasons. I mean, that's pretty much is a legitimate nondiscriminatory reason, isn't it, Mr. Wade, that the person is officer of the year and that they have far more experience in doing the particular job? And that seems to be a traditional, regardless of whether it was on a tape recording or in a report, that seems to be pretty strong evidence of a legitimate nondiscriminatory reason, doesn't it? It would be if it were true, and it was up to the jury to decide whether it was true or not. You could be highly qualified, highly qualified, but your qualifications not be the reason. And we showed overwhelming evidence that the reasons were bogus, that the whole deal, the whole job. Where is this overwhelming evidence? The only thing that I could see was that she said that the secretary said that it was pro forma or something like that. Well, I'll just give you a good example. Look at page seven of my brief. This is the interview for the job reply brief. It says on page seven, this is just a direct quote from him, the interview they had supposedly for the job, here was a question. You already knew, though, before you all ever had the interview, that the housing director, that's the other discriminator, Hill, wanted Pruitt. That's what you testified earlier. I did. That's the chief. So the interview didn't serve any purpose, did it? It did not. In other words, the whole interview was bogus. They'd already made up their minds before the interview ever occurred. And they supposedly selected his job based on the job interview. But the whole scam, it was really a scam. They started out, first of all, it had been customary that the senior officer at the housing department, which was my client, Ms. Pruitt, is the officer in charge. Sometimes they wouldn't have but one officer, but whenever they had more than one, that was customary. So she was, in the first place, if they're going to have a second officer over there, then she would naturally have been it. So instead of putting the senior officer in charge, they created what they claimed was a new position. The jury would be entitled to think the whole thing was bogus because they could never produce a signed contract or one with the right depths and information. But they put another officer over there and immediately put him in charge. Before any interviews or anything, Ivy, police chief Ivy, put him in charge over her before anything else. Did she have some situations in her personal or medical life that would make her not appropriate to be in charge? Well, that's an interesting question. Given the fact that she couldn't do a chase or she would get too anxious or whatever that, isn't that in the record? After the fact, after they didn't select her for the job, she became very depressed. And that's one thing they've never said, that that was the reason. I thought that was before she had been on leave because she could not handle any kind of ‑‑ she was good at the helping people on the property, and I can't think of what you call that part, community policing. Community relations.  But that in an emergency, she could not handle any kind of stress like that. Is that not in the record? I didn't make that up, did I? No, it's in the record. But what it's about is she became very stressed after she didn't get this job and very upset about it and took medical leave. And she did have some psychological problems relating to her, a lot of deaths in her family. That's all after the fact. That's not before the fact. As far as deaths in her family, she'd had deaths in her family. But what I'm telling you, Your Honor, is they have never claimed that she was unable to do the job because she had stress in her family or anything of that sort. In fact, they've said in their secret tapes, they say in there that you've done a ‑‑ you know, we know what a job you've done that nobody else could do. They never claim that. That's never been a claim. It's in the record that she went on medical leave and she was so upset about not getting this position. But, Your Honor, what I'm entitled to say, there is not uncontroverted evidence that there ‑‑ that there ‑‑ uncontradicted evidence that nondiscrimination was a reason because the jury doesn't have to believe that qualifications were the reason. The jury could decide to believe that this person that does so well with the community, the jury was entitled to accept that and say that's true, that she was the logical candidate. And they're also entitled to believe, Your Honor, that the whole interview process was a hoax because the chief's assistant had called her and told her that this interview is a fake interview and they're going to give this job to Pruitt. So, the question, Your Honor, is for the jury as to whether there are reasons, that is, that qualifications were the real reason. Let me assume this, Your Honor. Let's make this assumption. Let's assume that they're right. He is so qualified as a police officer, he's ultimately qualified. Why does that mean that their motive could not have been discrimination? They could have sent him over there because he had superior qualifications and that they could say that they were going to give him the job. They could have sent him over to that division in the first place for that very reason. And if that's the reason, why do they need all this stuff about a made-up position, making up a position of giving a job a title but doing exactly the same thing as an officer in charge? Paige. I need to discuss this, Your Honor. We have gotten to the point where the jury doesn't get to decide anything. They give the reason, and then we give the reasons why it's bogus and why the jury shouldn't believe it, and the judge just decides, well, I accept the reasons given by them. I accept their reasons that he's more qualified. Well, that's up to the jury. The jury ought to be able to decide that. I think that Justice Thomas and Justice Gorsuch have talked about this recently, this very issue. So you have some company there that they think that this whole McDonnell-Douglas thing is not being applied correctly and about the pretrial. Well, I mean, I think I know generally what you're talking about because there's a certain opinion about it, but that's right. The question ought to be the Stockton case. The Supreme Court, Your Honor, there was evidence in the record from which the jury could find that their whole reasons were bogus. And from that, then the jury ought to get to decide the case. What is the evidence that it's bogus? The fact that the person already knew their qualifications. It's a small office, and he already knew the people and had it in his mind that someone could be the better fit. How does that make the whole process bogus? Well, because, Your Honor, they make up a job that has no job duties. Abbey admitted. He said this new job, it's not going to be officer in charge anymore. They're going to give the job a new title. And Officer Abbey, the decision-maker, could not show any difference between those job duties and the job of officer in charge. And they claimed to be interviewing for a new job. So it's up to the jury. I mean, that's not a legal question for the court to decide whether they're telling the truth. That's up to the jury to decide. So it's your position that even if he is far better qualified on every objective, meritorious test, the fact that she has some testimony in the record that somebody told her that it was a bogus process, then that gets you to a jury, even if he's a far better qualified person for this particular job? In the first place, it's not just somebody told you this is the chief's assistant, the chief's executive assistant, somebody that's in a position to know. Plus, they had all the evidence of racism that both Abbey and Hill were racist. All that evidence was in the record. And it's really, although they claim the city board made the decision, the fact is that the decision was made by Abbey and Hill when you read the record. It's our best case that when the other person is clearly better qualified, assuming the argument, oh, that's true, that if you have an allegation that, you know, there's a skunk in the room or something, you know, some kind of terrible thing happened, racism, which would be terrible, that an allegation that somebody was racist is enough to overcome that. Well, the decision-makers are racist, Your Honor, and our best case is that they bogus-ed up the whole process. If they were legitimate. What case says that? Well, this case is a general case. The Patterson case in the U.S. Supreme Court says there's any number of ways you can prove pretext, and there's no particular matter that has to be used. And, Your Honor, when Your Honor says that they based it on qualification, this was a particular job. This was a job of being a security officer for a housemaid where she had been enormously successful, and he was gone half the time. And he said he wasn't there half the time. He did a good job when he was there, but he wasn't there half the time. He didn't know the tenant's name. And the jury could have found that she was far better qualified because she had this relationship with the tenants that had held the crime down. And so the jury, it was up to the jury, Your Honor. We get to the point that the jury is nothing but figureheads. They don't get to decide anything. If their case is so reasonable, why are they so afraid to take it to the jury, if their case is so reasonable? Why can't we let the jury decide? They could do that quicker than they could write this brief. And if it's reasonable, they've got an 80 percent white jury up there. They ought to be able to convince them. At some point, Your Honor, the jury is nothing but figureheads. Your Honor wrote that decision in the Securities and Exchange case recently at the Supreme Court of Firms. This is along the same lines. Let the jury decide. It's just a matter of common sense. And if you're right, Your Honor, and if Your Honor's position is right, then the jury will buy it and it will be done with. You know, there have been many, many scholars and then lesser people who have written about how you can do employment discrimination more quickly by just going to the jury rather than to have years of appeals. But this is the system we have, and we're middle management in the system that we have, Mr. Wade. So that's where we are. Ms. Coleman, I think we're going to hear from you next. Is that right? Good morning. May it please the Court. Gail Coleman for the Equal Employment Opportunity Commission. The EEOC is participating in this case only on the retaliation claim and only on the question of whether a reasonable jury could find an adverse action. In order to establish a premature case of retaliation, the plaintiff must show a protected activity, materially adverse action, and causation. Here, the district court held that no reasonable jury could find an adverse action. It did not cite any standard at all in making that holding. The court looked only at whether the plaintiff's rank and pay had changed and whether she now had unfairly burdensome duties, and it noted that she had been given a choice of news stations to transfer into. But the court cited no authority that these are the only facts that matter. And in fact, its analysis conflicts with controlling law both from the Supreme Court in Burlington Northern and from this court most recently in Johnson v. Board of Supervisors, which came out last year, and then 2015 there was Porter. Burlington Northern tells that Title VII's fundamental purpose is to prohibit discrimination in the terms or conditions of employment because of who somebody is. But it also explained that the statute only functions if people do not fear retaliation for speaking out when they believe that there may have been a Title VII violation. For that reason, the anti-retaliation provision, the Supreme Court said, must be interpreted very broadly. Something is an adverse action for purposes of the retaliation provision if it is anything that might well have dissuaded a reasonable worker from making or supporting a charge of discrimination. What fits that bill in this case that's been overlooked here? I'm sorry? What fits that bill in this case that's been overlooked by the district court in your assessment? I hear there is evidence that Frank's ultimate goal had always been to work in housing. She testified to that at page ID 852. She took a pay cut to take this job. She was highly engaged with the residents. She conducted weekly girls' groups. She connected with the parents. Although there was a high turnover in the job, she stayed for five years. She declined the opportunity to apply for a position as chief of police in Verona. And at page ID 802, she testified that she planned to retire from housing. How was she discriminated against in this case, according to the record? How was she retaliated against? What happened? The allegation of retaliation is that after she filed her EEOC charge, her position was terminated and she was forced to transfer elsewhere. Now, the EEOC has not taken a position on causation in this case. What our position is is that if a reasonable jury does find causation, then that allegation is an adverse action. A reasonable jury could find that a reasonable person may well not complain about discrimination if it could lead to losing a job that she loved. And that's the allegation here. This issue is very important to the EEOC, and that's because people will not file retaliation charges if they fear retaliation. And then the EEOC could not function. So we urge this court to take the opportunity to provide guidance in this circuit. Burlington Northern is a longstanding case. It was issued in 2006, yet courts continue to get it wrong. So we urge this court to once again emphasize that an adverse action in the retaliation context is anything that might deter a reasonable person. Didn't we just do that on Bonk not too long ago? I mean, haven't we done that? No. I believe you're talking about Hamilton. And that is discrimination, not retaliation. Adverse action can be anything. It was a broad understanding of adverse action. Actually, Your Honor, I'm glad you brought that up, because as Burlington Northern explains, the substantive prohibition on discrimination, Section 702 prohibits adverse employment actions, which this court used to interpret as an ultimate employment action, and then Hamilton said that's no longer true. The retaliation provision is different. It doesn't say anything about employment actions. It can be something that is not even related to employment, and the standard there is a materially adverse action. In Burlington Northern, the court said a materially adverse action is probably going to be easier to find than what you had already said was an ultimate employment action. The ultimate employment action for a discrimination case is no longer the standard. That doesn't necessarily mean they're identical, but certainly given that it is now easier to prove an adverse employment action in the discrimination context, it would be illogical to make it harder to prove it in the retaliation context when the Supreme Court had previously said that doesn't make sense. If we need to adjust our precedent, you think our precedent is already okay, right? The precedent is absolutely already okay, yes. I think it becomes confusing sometimes in the retaliation context when the court does talk about an adverse employment action, because that is not really the standard for retaliation since it doesn't have to be employment. In the retaliation context, the standard is really a materially adverse action defined as Burlington Northern defined it to mean something that might well deter a reasonable employee in the context of that employee's experiences. Thank you very much. I appreciate your help in making sure we write carefully. Thank you. Thank you. You may proceed. They were sending me a note about the sound system and the hissing sound. Thank you. Apparently they have to reboot the system, but that's not your problem. We can hear you, and you should proceed, and we need to start over again so he's not losing his time. Good morning, Your Honors. May I please report? At issue in this case are two employment decisions. The first is the decision not to select the plaintiff or coordinator position, and the second is the subsequent decision to dissolve the housing unit altogether. Judge Mills correctly granted summary judgment on both claims. There's a lot of problems with the plaintiff's case, but the starting point is the identity of the decision maker. It is the fundamental rule in employment cases that the focal point is on the, quote, final decision maker. In other words, for a plaintiff to prevail, he or she has to show that the final decision maker took an adverse action for unlawful reasons. It's dispositive in this case that by virtue of Mississippi State law, the coordinator position was decided by a seven-person board. There has never been any allegation, contention, argument, certainly no evidence that any member of that board had unlawful animus towards the plaintiff, much less a majority of them, as the case law requires. The same thing goes for the decision to dissolve the housing unit. That decision was made by the police chief, and the plaintiff testified at her deposition that he had no unlawful animus toward her, that he was good to her. In fact, the record evidence shows that he supported her when she got arrested for domestic violence. He set up a food account for her when she was struggling financially. The alleged bad guys in this case, in the plaintiff's eyes, have always been Captain Ivey and Director Hill. But that is a red herring. The plaintiff has never invoked the cat's paw theories, and even if she had, that exception does not apply on this set of facts. Whose assistant allegedly said that this was already a cooked-up deal? That was the police chief's assistant. Mr. McCutcheon, the one who… So what do we do with that if the assistant says, my boss, this is all rigged and I know it? Well, my friend has made a lot about the recordings calling them hearsay. I would suggest that's hearsay as well. But the more important point there is I think she was suggesting that Director Hill wanted Pruitt for this coordinator position. That may very well be true. But that has nothing to do… Nobody has ever tied any evidence to… She wasn't suggesting that her own boss wanted… She wasn't, Your Honor. She never said that. The plaintiff has never argued that. There's no evidence of that at all. There's nothing to tie the actual decision-makers here to anything. Again, the alleged bad guys at the district court level and here on appeal are Director Hill and Captain Ivey. My friend on the other side basically argues that any mere agent can result in strict liability in an employment case. That, of course, is not the law. For the Catspaw exception to work, you have to have a final decision-maker who is duped by some lower-level employee. In other words, the final decision-maker has no unlawful animus at all, but they're tricked by a biased recommendation. That doesn't work in a case like this one where you have a multilayered process. You have to remember you had two African-American females who interviewed the candidates and then submitted a recommendation to the police chief. He met with her twice. She submitted written correspondence. The African-American assistant chief met with her as well. And only after all of these things happened was the recommendation then blessed by the Board of Aldermen. So no— So if—just—does his theory not work because the person who said that it was a cooked-up deal doesn't say the right— if she said the Board has got it as a cooked-up deal, then there would be a fact issue, right? And that would have survived summary judgment, correct? If she had some evidence that— If she's got tests, she says, this woman told me that on X date, and I went and wrote it down, you know, even if she—she didn't even have to say that. The case would certainly be a lot better, Your Honor. Okay, because it would be the right decision-maker. Correct. But it can't create a fact issue because it's not the right decision-maker. Could it create a fact issue even if the other person is better qualified, though? I think the cases say that it depends on how the plaintiff pleads the case. If they're trying to show discrimination by disparity in qualifications, then clearly better qualified is the standard. If they have—that doesn't mean they can't show other evidence. And I certainly appreciate, you know, Your Honor's point about the big debate about McDonnell Douglas and convincing Mosaic and all that. I would suggest to the Court under, you know, any standard, you've got to have sufficient evidence to rise to the level to show discrimination. I'm not sure if you have to have sufficiency at that point or if you just have to create a fact dispute. There's a—we can go round and round about that, and I don't think we want to. Well, under this Court's precedent, once you get to the pretext stage, this Court has always said in cases like Laxton that you've got to have substantial evidence of pretext. Is that overstatement on the statute, though? Or is it really just you have to show a material fact issue? I think that's right. But under—if you track Rule 56, Your Honor, there's no fact question here when it comes to trying to tie any animus or any unlawful reason to any relevant decision-maker. Because the animus is with the wrong people, and there's no cat's paw here. That's exactly right, Your Honor. Under no stretch of the imagination is this a rubber stamping because of all the process I just mentioned. What the cases say are that you've got to have uncritical reliance. And essentially, if a plaintiff has his or her say, then that breaks proximate causation. She had far more than her say in this circumstance. She had multiple meetings. There's evidence in the record of the recordings of all these meetings. So she had every chance in the world, you know, to meet with all of these people. And again, the lower-level involvement of Director Hill and Captain Ivey, even if you spot her the fact that, you know, she could have some evidence of their unlawful motive, then it doesn't matter because there's no proximate causation as she moves up the chain. And that's what— What about the whole idea of even creating this position, that this whole thing was a scheme to begin with? What do you do with that? Your Honor, there's nothing about that that is accurate. If you go back through the timeline, it is conceded, and I think they mentioned a lot of the turnover in the department. So if you go back all the way to August 20th when Cody Pruitt first transferred into the housing unit, as early as that time, Director Hill was pushing for there to be a sergeant position there to eliminate the turnover. Chief McCutcheon said no. And it was a year later, August 21, where this position was created because Oxford Housing Unit was willing to offer a stipend in support of it. So there's—for the same reasons that the discrimination claim fails, that's why the retaliation— there's no retaliation here either because McCutcheon made that decision, and there's no animus whatsoever. Nobody's ever put forth any animus towards him. And even if you go on down the line, there's other— Judge, did the district court decide that it wasn't an adverse employment? How did the district court decide it, and that's in the point that the EEOC is making? Right, and I definitely dispute that as well. The problem with both the EEOC and my friend on the other side is that they rely on the subjective beliefs of the plaintiff. There's quotes in the brief about how much she loved the housing unit, how much she wanted to be around kids. That—the standard is an objective one, not a subjective one. Why isn't discontinuing that unit—why isn't that enough? Why is— That's enough to be the proper type of adverse action. I don't want to use the wrong language. Right, well, it's not, Your Honor, because it's an objective standard, and this court has always looked at the issue of things like did it change pay, did it change schedule. I know, but we don't do that anymore exactly in that context. Well, Your Honor, okay, so the Supreme Court's decision last term in Muldrow, that's perhaps the best case here of all of it. There was a lot of discussion about this court changing the adverse action standard in the discrimination context. That is certainly true. And when you get to Muldrow last term, what the unanimous opinion did there is say, okay, in the discrimination context, there is no significant requirement. But they said it expressly is a significant requirement in the retaliation context. You disagree with the EEOC that it's even a lesser standard in the retaliation context. Most certainly. And you don't agree that it's equal either. I do not. You think it's a higher standard to show retaliation. It most certainly is, and the Muldrow opinion tells us that directly. Because in retaliation, materially adverse action means that you have to separate trivial from, quote, significant harms. And the whole case in Muldrow was about getting rid of the significant component in discrimination cases. And you had the concurring opinion by Justice Thomas in Muldrow that said, okay, I can go along with this, but even under the lower standard, this lateral transfer was nothing but a preference on the part of the plaintiff in that case. So certainly, if the plaintiff in Muldrow can't meet the lower level standard in the discrimination context, she also can't meet the higher standard that the Supreme Court says continues to apply in the retaliation context. And she was definitely offered other positions. Three positions. And she got to choose between those three. And it's a little ironic because she talks about how much she loved being around kids. She was literally offered to be a school resource officer, and she turned that position down. And as an objective matter, it's important that once the stipend came about for the housing unit, the only two people that applied were the people that were already over there, which suggests there was nothing objectively desirable from other members of the police department where everybody was trying to transfer into that department. I thought those people had the inside track and they weren't even going to bother. You can't say for sure that it means it's not as good. Maybe they have, but I think it does speak to the objective nature of it. Perhaps the most interesting issue in this whole case is the one that the district court didn't weigh in on, and that's the Gupta exception for exhaustion. That certainly is yet another alternative reason why the retaliation claim would fail. This circuit and others have wrestled with the fact that whether or not Gupta survives the Supreme Court's decision in Morgan. Other circuits have said it does not because there's no textual basis for continuing to apply the Gupta exception. Even the circuits that continue to apply Gupta-like cases have limited the case to the facts, where you have a situation where an alleged retaliatory act happens after the lawsuit is already filed such that it wouldn't make any sense to run back to the EEOC and reopen the charge. That's not what happened here. Her discrimination claim was pending before the EEOC when the alleged retaliatory act happened, and she didn't go to the EEOC and give them an opportunity to investigate. Instead, she filed the lawsuit, which makes it ironic that the EEOC would support the plaintiff in this case when my friend was so hard on them in the opening brief about how slow they are. But I disagree with them on the adverse action part of it. The Gupta issue is probably the most interesting issue in this whole case, but I don't think it's what needs to get there. A few other notes that I made, Your Honor. Now, my friend repeatedly calls this a scam on behalf of the city. The only evidence of a scam in the record is the plaintiff's text message that says after she was not selected for that position, she sent out a text message saying she's going to file a lawsuit where she can hope she can get enough money to pay off her house. So I disagree with that characterization. I disagree with the EEOC's, you know, they say a broad understanding is what's required for adverse action, and I think, you know, she said it would be illogical to interpret discrimination and retaliation adverse action standards differently. That is precisely what the Supreme Court said last term in the Muldrow decision. That is exactly what they said, and the word significant does not appear in the EEOC's brief anywhere, and that is the standard. You don't really want us to do the Gupta, do you? There's no reason to, Your Honor. I mean, the Gupta, you know, we, our circuit wrote the case in the discrimination context that it was, you didn't have to, it wasn't required, and that was affirmed by the Supreme Court, and it seems like that's a risky proposition for you. Well, post, well, I think that was pre-Morgan. I think after Morgan, every court that has actually teed up that decision has said it cannot be reconciled with Morgan because there's no textual basis in the statute to say you get to bypass the EEOC. So, you know, again, there's no reason to reach that in this particular case. Thank you, Your Honor. We're going to hear from Mr. Allen now. Yes, Your Honor. Good morning. Good morning. Again, Jeff Allen here on behalf of Apley Oxford Housing Authority. You know, a few notes now that I've heard two others speak. So Oxford Housing Authority, I guess, you know, points of interest here in terms of where this plays in, and maybe this is, you know, putting the cart before the horse, but in order for us to have, you know, any involvement, any liability, and as this court knows, the district court did not rule upon the arguments that we presented. In other words, there were two outs for the Oxford Housing Authority at the lower court level. The first was that which the court has been discussing with both attorneys this morning, and that is that there was, in fact, no adverse or no discrimination in terms of the decision that was made and that it was a merit-based decision. So, obviously, that's where the court, you know, based its decision, and for that reason, Oxford Housing Authority was dismissed along with the city of Oxford. But the other argument that was not addressed by the court was the fact that the Oxford Housing Authority was not the plaintiff's employer, and therefore, I believe this court would have, you know, the ability that in the event that, you know, something is sent back or overturned with regard to the adverse or the discrimination claim, that there still could be a finding that the Oxford Housing Authority is still subject to dismissal. We've heard about Mr. Hill, the director of the Oxford Housing Authority. I would just, you know, tell the court that in reviewing the record, there's been discussion of subjective beliefs here, subjective beliefs of the plaintiff with regard to her perceptions, et cetera, which is not the standard in terms of the law cited by the counsels earlier. And there's also, with regard to the allegation, because they've got to—they're trying to bring Hill into this, is that he was racist because a former employee testified that she didn't see him speak to the black employees. And that's, as I recall, the entirety of what's in the record. So we have a former black female employee who offered testimony and said that Director Hill, who oversees, by the way, nine out of the 12 employees at the Oxford Housing Authority are, in fact, black. So he must not talk to anybody. And he also is the one that, instead of putting himself on that interview committee, placed his—kind of his chief of staff, who was a black female, along with another black female, on the interview committee. What exactly are you hoping to get for your client here today? I'm hoping that the court finds that the Oxford Housing Authority is not the plaintiff's employer. And in doing so, I would note that, essentially, Ms. Franks, in brief, they didn't really address that issue. You know, the key case is the Broussard v. Bessier case, 789 F. 2nd, 1158. There are a number of factors identified therein, and I think that an objective view of all of those indicates that we were not her employer. Hiring, firing, supervising, setting schedules, the record is full that that's all done by the city of Oxford. Who pays the salary, who withholds taxes, who provides benefits, sets the terms and conditions of employment, all Oxford. On direct testimony, the plaintiff testified that the city of Oxford was her employer. That's in the record at 499 and 500. The plaintiff testified that Oxford hired her. The plaintiff testified that the city of Oxford can fire her. The plaintiff testified that she needs to go to Oxford for time off and that the city of Oxford, of course, paid her. So the only involvement in terms of the Oxford Housing Authority is that, of course, that's where she was stationed and that the record indicates that there was a contract at one point where $50,000 was paid by the housing authority to the city just as a subsidy to hire, I think it was referred to as one and a half employees. Not to hire this plaintiff, not to hire Mr. Prude, not to hire anybody else, but just to have someone there all the time. And, of course, the Oxford Housing Authority's reach... Did Hill make the decision not to have this unit and does that implicate Hill or the housing unit in the retaliation claim? We are, to the best of my knowledge, we are not in any way involved in the retaliation claim. There was no involvement by Hill. In fact, I would think that the Oxford Housing Authority would have thought it detrimental that they lost having a full-time officer, which I think shows the lack of authority and influence by Mr. Hill. Thank you. Mr. Wade, you've saved time for rebuttal, sir. Your Honor, counsel's done a very skillful job in their briefing and oral argument in confusing two totally different statutes. The counsel claims that the only way we can prove discrimination is showing that the Board of Aldermen discriminated. I understand he has totally managed to obscure the difference between a 1942-1983 action and a Title VII action. In a Title VII action, all we have to prove is respondeant superior, that these agents of the city, managers of the city, which was Captain Abbey and the manager of the housing authority, discriminated. That's what we have to prove under Title VII. It didn't make a damn's worth of difference what the Board of Aldermen did. They are liable on a respondeant superior basis. So what they have done now is try to make this look like a 1983 case and say, we've got to show official policy decision by the Board. It's ridiculous. I mean, they've done it and put it in their briefs. And the cases they cite, ironically, both cases they cite were my cases. One of them was a horrible case from the city of Houston where she was a direct employee of the Board of Aldermen. Of course, she had to show the Board discriminated. The other one was a Griggs case where Mr. Griggs was an employee of the Board of Supervisors. And they had this court here. You've got to prove a majority discrimination by the Board. That's not the case here. This is totally different. The decision-makers were Hill and Abbey. There's no question about that. When Your Honor reads the depositions, and Your Honor, by the way, on the subject of this business about over-qualifications, you know we took their depositions, and all we talked about in the depositions was this hopes. Counsel was there. If qualifications was the reason they were making the decision, it looks like he would have asked them, and it looks like they would have said it. We chose this based on qualifications. Instead of that, what we had was the evidence that came out in the depositions is this subordinate employee of Hill, these two low-level subordinate black employees, were directly under him, and they were purporting to make the recommendation, but based on what Abbey, Abbey was present with them, and Abbey was criticizing Franks and saying the white candidate is already doing the job. He's the leader. He's already doing the job in the first place. So Abbey's there influencing these low-level employees of Hill. They're all over in the housing department building where Hill's office is. And to just show you that it wasn't the Board and it wasn't the Chief that made that decision, they told, as she said, they told her immediately after the interviews. Of course, that would have been time for the Board of Aldermen to have made the decision or the Chief. On page 12 of my reply brief, I quote the Chief on what he said about it. He said, the recommendation is made to me, and then I go with the recommendation. He said that throughout. He said that on one of his tapes. He was a strictly, hadn't been Chief very long, but he's strictly a rubber stamp. I mean, I think he was probably meaning well at that time. I don't think he ever approved of this scam or knew anything about it. He didn't know anything about this board contract. He said he couldn't find it anywhere in the files. In fact, none of them could find it. He was, I don't know, anybody could have drawn it up except Hill because Ivy said he had no idea what was in it or how it would have changed anyway, the officer in charge position. So far as the city's involvement, your Honor, counsel says, well, the city wasn't involved. Well, according to them, according to Ivy and Hill's deposition, Hill went to Ivy and asked for the creation of this new position. He started the whole deal. And as far as the housing authority's involvement, they provided the money. They provided $50,000 of federal taxpayer money in order to have a police officer over there. They were paying the money to subsidize it. They were also going to pay the additional money, the $5,000 a year stipend or whatever it was, for the new officer. So the housing authority, they did it together. It was two peas in a pod. And as far as I might just say a word about the retaliation, how could the chief, if you believe them, if you believe that contract is real and not just a bunch of made-up hokey, if you believe that, then how was it they could just cancel the contract and cancel the housing authority protection? Because they had a written contract. How could they do that if it's real? So, your Honor, what I'm saying is this case, there's a lot of details in this case, but it's not about who can write the best briefs and who can come up with the most facts. It's a question about everyday common sense, and the jury, I believe, should have some role in our judicial system, and this is a case where they should have that role. Thank you very much. We appreciate the arguments. Thank you, Mr. Wade, Ms. Coleman, Mr. Butler, and Mr. Allen. This case is submitted. The court will take a brief recess before considering the last case for the day. Thank you. Thank you, Your Honor.